Scott Edward Cole, Esq. (S.B. #160744)
Laura Van Note, Esq. (CA S.B. #160744)
Mark T. Freeman, Esq. (S.B. #293721)
**COLE & VAN NOTE**
555 12TH Street, Suite 2100
Oakland, California 94607
Telephone: (510) 891-9800
Email: sec@colevannote.com
Email: lvn@colevannote.com
Email: mtf@colevannote.com

Leigh S. Montgomery*
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

**COUNSEL FOR PLAINTIFFS AND THE PROPOSED CLASS**
(* denotes *pro hac vice* forthcoming)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EDWARD FOX and SUZANNE BRYAN,** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>vs.<br><br>**EPIC SYSTEMS CORPORATION, REID HOSPITAL & HEALTH CARE SERVICES, INC., HEALTH GORILLA, INC., and MAMMOTH PATH SOLUTION, LLC,**<br><br>*Defendants*. | Case No. 2:26-cv-4678<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES:**<br><br>**1. Negligence;**<br>**2. Breach of Implied Contract; and**<br>**3. Breach of Implied Covenant of Good Faith and Fair Dealing.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Edward Fox and Suzanne Bryan ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Epic Systems Corporation ("Epic") and Reid Hospital & Health Care Services, Inc. ("Reid"), Health Gorilla, Inc. ("Health Gorilla"), and Mammoth Path Solution, LLC ("Mammoth") (together, "Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record:

## I. <u>INTRODUCTION</u>

1. This class action arises out of the recent unauthorized access to and disclosure of the protected health information and personally identifiable information of patients of Defendants (the "Data Breach"), which held in their possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiffs and other current and former patients of Defendants, the putative class members ("Class").

2. Defendant Epic has publicly acknowledged that Defendant Health Gorilla, Inc., a health information network operator connected to Epic's Care Everywhere health information exchange platform, allowed its clients to access patient records stored by healthcare providers on Epic's systems—including records maintained by Defendants Reid—under the false pretense of "treatment" purposes. In reality, upon information and belief, Defendant Health Gorilla's clients were mining patient records to recruit potential plaintiffs for class action lawsuits. Upon information and belief, Defendant Reid mailed a notice of the Data Breach to Plaintiffs and certain Class Members. However, neither Defendant Epic nor Defendant Reid has provided

Plaintiffs or Class Members with adequate individualized notice identifying the full scope of the breach or how Plaintiffs' data was misused.[1]

3. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

4. The Data Breach resulted from Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for treatment.

5. Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant Epic's computer network and servers in a condition vulnerable to unauthorized access through inadequately controlled health information exchange systems. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

6. Defendants, through their employees, disregarded the rights of Plaintiffs and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions. Defendants also failed to disclose that they did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

---

[1] *See* Complaint, *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.); *see also* Complaint, *Patterson v. UVA Health, et al.*, Case No. 2:26-cv-01938 (C.D. Cal.), at ¶¶ 5–6.

7. In addition, Defendants' employees—and in particular, Defendant Epic's IT personnel responsible for monitoring the hosted systems—failed to properly monitor the computer network and systems that housed the Private Information. Had Epic's employees properly monitored the systems, they would have discovered the intrusion sooner.

8. Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of unauthorized third parties who accessed it through Defendants' health information exchange systems without legitimate treatment purposes.

9. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. Because of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11. Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

## II. PARTIES

14. Plaintiff Edward Fox is and at all times mentioned herein was an individual citizen of Indiana, residing in the city of Centerville.

15. Plaintiff Suzanne Bryan is and at all times mentioned herein was an individual citizen of Indiana, residing in the city of Winchester.

16. Plaintiffs provided Defendant Reid with their sensitive PII and PHI to receive healthcare services, and Defendant Reid in turn entrusted that information to Defendant Epic for storage and management on its technology systems.

17. Defendant Epic Systems Corporation is a Wisconsin corporation with its principal place of business in Verona, Wisconsin. Defendant Epic's registered agent for service of process is Judith R. Faulkner, 1979 Milky Way, Verona, Wisconsin 53593. Epic regularly conducts and solicits business in California.

18. Defendant Reid is an Indiana non-profit corporation with its principal place of business in Richmond, Indiana. Defendant Reid's registered agent for service of process is Benjamin J. Wells, 1100 Reid Pkwy, Richmond, Indiana 47374.

19. Defendant Health Gorilla, Inc. is a Delaware corporation with its principal place of business at 2555 Ponce de Leon Blvd., Suite 300, Coral Gables, Florida 33134. Health Gorilla is authorized to transact business in California and, on information and belief, maintains offices located at Mountain View, California. Health Gorilla operates as a health information network and interoperability platform, serving as a Qualified Health Information Network ("QHIN") under the federal Trusted Exchange Framework and Common Agreement ("TEFCA") and as an Implementer under the Carequality framework. In that capacity, Health Gorilla serves as a gatekeeper that controls which entities may access patient medical records through nationwide health

information exchange ("HIE") frameworks, including the same HIE platform through which Defendant Reid's patient records, including those of Plaintiffs and Class Members, were accessible. Health Gorilla may be served through its registered agent.

20. Defendant Mammoth Path Solution, LLC is a Delaware limited liability company with a principal place of business at 20505 Crescent Bay Drive, Lake Forest, California 92630. When joining the Carequality and TEFCA interoperability frameworks through Defendant Health Gorilla, Mammoth Path Solution asserted that it was a healthcare provider seeking access to patient records for treatment purposes. Mammoth Path Solution, LLC may be served through its registered agent.

## III. JURISDICTION AND VENUE

21. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class and at least one other Class Member is a citizen of a state different from Defendants, including Plaintiff herein.

22. Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. § 1367.

23. Defendants are headquartered and/or routinely conduct business in the State where this District is located, have sufficient minimum contacts in this State and have intentionally availed themselves of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

24. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiffs' claims took place within this District, and Defendants do business in this Judicial District.

25. Defendants Epic and Reid have further consented to and confirmed the

propriety of this forum by affirmatively filing suit against Health Gorilla and Mammoth in this District. *See Epic Systems Corp., et al. v. Health Gorilla, Inc., e at*, No. 2:26-cv-00321 (C.D. Cal.). That action involves the same Defendants, the same data-sharing relationships, and the same underlying conduct that forms the basis of Plaintiffs' claims here. Having voluntarily invoked the jurisdiction of the Central District of California to litigate claims arising from those very relationships and transactions, Defendants are in no position to contend that this Court is an improper forum for Plaintiffs to do the same.

## IV. <u>FACTUAL ALLEGATIONS</u>

***Defendants' Businesses***

26. Founded in 1979, Defendant Epic is a privately held healthcare software company, and is the largest electronic health records vendor in the United States by market share.[2] Epic develops, licenses, and supports large-scale software systems for electronic health records, serving academic medical centers, hospitals, health plans, physician groups, and other healthcare providers across the country and internationally.[3] Epic employs approximately 14,000 people, reported revenue of $5.7 billion in 2024, and holds a 42.3% share of the acute care hospital EHR market.[4] According to Epic, more than 305 million patients have an electronic record maintained within its systems.[5]

27. Founded in 1905 as Reid Memorial Hospital, Reid Health is a nonprofit regional health system headquartered in Richmond, Indiana. Over more than 120 years, the system has grown from a single community hospital into a comprehensive health

---

[2] *Epic Systems Corporation*, Wikipedia, https://en.wikipedia.org/wiki/Epic_Systems (last visited March 11, 2026).

[3] *Id.*

[4] Marissa Plescia, *Epic's Revenue Climbs to $5.7B*, Becker's Hospital Review (Sept. 17, 2025), https://www.beckershospitalreview.com/healthcare-information-technology/ehrs/epics-revenue-increases-to-5-7b/.

[5] *Epic Systems Corp.*, Wikipedia, https://en.wikipedia.org/wiki/Epic_Systems (last visited March 11, 2026).

network operating a 189-bed main campus hospital, more than 50 satellite locations, and 62 provider offices across seven counties, staffed by over 300 providers and more than 3,200 clinical and non-clinical caregivers.[6]

28. Plaintiffs and Class Members are current and former patients (collectively "patients") of Defendant Reid whose Private Information was stored on systems hosted by Defendant Epic.

29. As a condition of receiving healthcare services, Defendant Reid required that its patients, including Plaintiffs and the Class Members, provide Defendant Reid with their Private Information, including at least the following: names, dates of birth, Social Security numbers, addresses, telephone numbers, email addresses, driver's license numbers or state identification numbers, health insurance information, Medicare or Medicaid identification numbers, employer information, emergency contact information, medical record numbers, medical history and prior diagnoses, billing and claims information, financial account information, and payment method information.

30. Defendant Epic stored this Private Information in its information technology computer systems and servers, on information and belief located at its headquarters in Verona, Wisconsin.

31. On information and belief, the information held by Defendants in their computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

32. Upon information and belief, in the course of collecting Private Information from patients, including Plaintiffs, Defendant Reid promised to provide confidentiality and adequate security for the data it collected through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements and industry standards. Defendant Epic, as a business associate of Reid,

---

[6] *About Reid Health*, Reid Health, https://reidhealth.org/About-Reid-Health (last visited April 29, 2026).

likewise assumed obligations to maintain the confidentiality and security of the Private Information entrusted to it

33. Plaintiffs and the Class Members, as patients of Defendants, relied on these promises and on these sophisticated business entities to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Patients, in general, demand security to safeguard their Private Information, especially when their Social Security numbers, PHI, and other sensitive Private Information is involved.

34. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendants absent a promise to safeguard that information.

35. Plaintiffs and the Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such Private Information confidential and secure from unauthorized access.

36. Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendants have a legal duty to keep consumer's Private Information safe and confidential.

37. Defendants had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

38. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

***Epic's Health Information Exchange and Defendant Health Gorilla's Conduct***

39. Defendant Epic develops and operates Care Everywhere, a health information exchange ("HIE") platform that enables the sharing of patient records across healthcare organizations. According to Epic, Care Everywhere facilitates the exchange of over 20 million patient records daily.[7] Defendant Reid's patient records, including the Private Information of Plaintiffs and Class Members, were accessible through the Care Everywhere platform.

40. Defendant Health Gorilla, Inc. is a health information network and interoperability platform with its principal place of business in Coral Gables, Florida. Health Gorilla operates as a QHIN under TEFCA and as an Implementer under the Carequality framework, serving as a gatekeeper that controls which entities may access patient medical records through these nationwide data exchange frameworks.[8] Health Gorilla connected to Defendant Epic's Care Everywhere platform and allowed several of its clients to use the health information exchange to request patient records from healthcare providers connected to Epic's system, including Defendant Reid.[9] As a gatekeeper, Defendant Health Gorilla had a duty to verify that entities requesting patient data had legitimate treatment purposes and proper authorizations before granting access to those records.

41. Upon information and belief, Defendant Health Gorilla's clients requested patient records from Defendant Reid through Epic's Care Everywhere platform under the stated purpose of "treatment." However, these requests were not made for legitimate treatment purposes. Instead, upon information and belief, Defendant Health Gorilla's clients were accessing patient records to identify and recruit potential plaintiffs for class action lawsuits—a purpose wholly unrelated to patient treatment and

---

[7] *See* Epic Systems Corp., Interoperability – Care Everywhere, https://www.epic.com/software/interoperability/ (last visited Mar. 11, 2026).

[8] Health Gorilla, Qualified Health Information Network (QHIN), https://www.healthgorilla.com/home/company/qhin (last visited Apr. 16, 2026).

[9] *See* Complaint, *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.), at ¶¶ 1–25.

in violation of the permitted uses of the health information exchange. [10] Defendant Health Gorilla failed to implement adequate procedures to verify the legitimacy of data access requests before granting access to patient records. Defendant Health Gorilla permitted entities to access patient data based solely on their unverified representations that such access was needed for treatment purposes, without confirming whether those entities had any actual treatment relationship with the patients or proper authorizations to receive such information.

42. Defendant Health Gorilla failed to implement adequate procedures to verify the legitimacy of data access requests, and as a result enabled unauthorized access to approximately 300,000 patient medical records from healthcare providers who use Epic's electronic health record system, by permitting access based solely on false representations of treatment purposes. Defendant Epic knew or should have known that Defendant Health Gorilla and/or its clients were misusing the Care Everywhere platform to access patient records for non-treatment purposes. Despite this knowledge, Defendant Epic failed to take timely corrective action and did not terminate or restrict Defendant Health Gorilla's access until on or about January 2026—well after the unauthorized access to Plaintiffs' and Class Members' Private Information had occurred. Plaintiffs incorporate by reference the facts alleged in *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.), including the history of the relationship among the parties to that action.[11]

43. Defendant Reid, as the covered entity under HIPAA, failed to implement adequate safeguards to monitor and control how its patients' Private Information was being accessed and used through Epic's health information exchange. Reid failed to ensure that third-party access to its patients' records through the HIE was limited to legitimate treatment purposes, as required by HIPAA and applicable law. Defendant

---

[10] *See* Complaint, *Patterson v. UVA Health, et al.*, Case No. 2:26-cv-01938 (C.D. Cal.), at ¶ 5.

[11] *See* Complaint, *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.), at ¶¶ 16–21); *Patterson*, Case No. 2:26-cv-01938, at ¶ 4.

Health Gorilla, as the health information network and gatekeeper controlling access to patient records through the HIE, separately and independently failed to safeguard the Private Information entrusted to it by ensuring only those entities with legitimate treatment purposes and proper authorizations could access patient records. Defendant Health Gorilla promised "ironclad data security, privacy, and governance" that "protects patient data," yet it failed to implement procedures adequate to fulfill that promise, including failing to verify that entities requesting patient data had legitimate treatment purposes or any actual treatment relationship with the patients whose records they accessed.[12]

***Defendant Mammoth Path Solution's Conduct***

44. In July 2024, Defendant Health Gorilla enrolled Mammoth into the Carequality and TEFCA interoperability frameworks. Consistent with the requirements of those frameworks, Mammoth represented to Health Gorilla, and Health Gorilla affirmed to all framework participants (including Epic and its healthcare provider customers such as Defendant Reid), that Mammoth sought access to patient records for treatment purposes. Those representations were false.[13]

45. Defendant Mammoth Path Solution, LLC and its affiliated Mammoth entities, through Defendant Health Gorilla's platforms, obtained sensitive patient records from Epic's healthcare provider customers—including records from Defendant Reid—through the Carequality and TEFCA frameworks. Upon information and belief, the true purpose of Mammoth's access was not patient treatment but the improper acquisition and monetization of patient records.[14]

46. Mammoth Path Solution, LLC lacked any legitimate treatment relationship with the patients whose records it accessed, including Plaintiffs and Class Members whose records were maintained by Defendant Reid and stored on Defendant

---

[12] Health Gorilla, https://www.healthgorilla.com (last visited Apr. 29, 2026).
[13] *See* Complaint, *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.), at ¶¶ 38, 161.
[14] *See id.* at ¶¶ 161–163, 170.

Epic's systems. Mammoth Path Solution used Medicare enrollment and CLIA certification credentials to obtain admission into TEFCA. By exploiting Defendant Health Gorilla's inadequate verification procedures, Mammoth Path Solution gained access to patient records it had no legal right to obtain, causing harm to Plaintiffs and Class Members whose Private Information was accessed without authorization and diverted from the healthcare system for improper commercial purposes.[15]

***The Data Breach***

47. The Data Breach at issue here occurred when third-party entities, operating through a health information exchange connected to Defendant Epic's systems, accessed patient records maintained by Defendant Reid without authorization and for purposes unrelated to patient treatment.

48. Plaintiffs and the proposed Class Members provided their Private Information to Defendants as a condition of receiving healthcare services. Defendant Reid transmitted Plaintiffs' and the Class Members' Private Information to Defendant Epic, which stored it on its computer systems and servers.

49. Unfortunately, Defendants failed to take adequate measures to protect their current and former patients' Private Information stored on Defendant Epic's computer servers. Defendant Epic failed to implement reasonable cybersecurity safeguards or policies to protect the Private Information hosted on its systems, and Defendant Reid failed to adequately vet and supervise its third-party vendor, Epic, to ensure that reasonable measures were in place to prevent, detect, and stop breaches of the systems where patient data was stored.

50. As a direct result of all Defendants' failures, Defendant Health Gorilla and/or its clients—including Defendant Mammoth Path Solution, LLC—gained access to patient records hosted by Defendant Epic through the Care Everywhere health information exchange, including records of Defendant Reid's patients, prior to January

[15] *See id.* at ¶¶ 164, 168–170.

13, 2026. Defendant Health Gorilla enabled multiple entities, including Mammoth Path Solution, LLC, to improperly access approximately 300,000 patient medical records from healthcare providers using Epic's electronic health record system, by falsely claiming the data was needed for treatment purposes. Upon information and belief, Defendant Mammoth Path Solution, LLC was among the entities that accessed the Private Information of Plaintiffs and Class Members stored on Defendant Epic's systems without authorization and without a legitimate treatment purpose.[16] The accessed records contained sensitive PHI of Plaintiffs and Class Members, including protected health information subject to HIPAA.

51. To date, Defendants have failed to disclose critical information concerning the Data Breach, including the number and identity of Health Gorilla clients—including Mammoth Path Solution, LLC—who accessed patient records, the volume of records accessed, the specific time period during which unauthorized access occurred, and the full scope of data obtained. These omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

52. Despite Defendants' intentional opacity regarding the incident, several facts may reasonably be inferred from Defendants' limited disclosures and from the allegations in Epic's own lawsuit against Defendant Health Gorilla (Case No. 2:26-cv-00321, C.D. Cal.), including: (a) that Defendant Health Gorilla connected to Epic's Care Everywhere platform and allowed its clients to request patient records under the guise of "treatment"; (b) that Defendant Health Gorilla failed to verify the legitimacy of those access requests, and those clients accessed and extracted patient data from Defendants' systems for purposes unrelated to treatment; and (c) that highly sensitive Private Information, including PHI and other personal identifiers, was exposed to

---

[16] *See* Complaint, *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, Case No. 2:26-cv-00321 (C.D. Cal.), at ¶ 20.

unauthorized access as a direct result of Defendant Health Gorilla's inadequate verification and monitoring procedures.

53. Under applicable data-breach notification laws, Defendants are required to provide notice when they reasonably believe that personal information has been accessed or acquired by an unauthorized individual or entity. Defendants' acknowledgment of the Data Breach therefore constitutes an admission that Plaintiffs' and Class Members' Private Information was accessed or acquired by unauthorized third parties, regardless of Defendants' attempts to minimize the severity of the incident through vague or technical language.

54. Defendants have failed to provide any meaningful mechanism for Plaintiffs and Class Members to report misuse of their Private Information, to determine whether their data has been misused, or to obtain individualized information regarding the Data Breach. This failure further exacerbates the harms suffered by Plaintiffs and Class Members.

55. As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers.

56. As a result of the Data Breach which Defendants permitted to occur by virtue of their inadequate data security practices, Plaintiffs and the proposed Class Members have suffered injury and damages, as set forth herein.

57. The U.S. Department of Health and Human Services requires, "[i]f a breach of unsecured protected health information affects *500 or more individuals*, a covered entity must notify the Secretary of the breach without unreasonable delay and in *no case later than 60 calendar days* from the discovery of the breach."[17] Further, if "the number of individuals affected by a breach is uncertain at the time of submission,

[17] U.S. Department of Health and Human Services, *Submitting Notice of a Breach to the Secretary* (Feb. 27, 2023) https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last viewed February 11, 2026) (emphasis added).

the covered entity should provide an estimate," and later provide an addendum or correction to HHS.[18]

58. To this day, Defendants have not provided notice of the Data Breach to The U.S. Department of Health and Human Services.

59. Defendants had obligations created by HIPAA, contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

***Data Breaches Are Preventable***

60. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members. Defendant Epic, as the entity hosting patient records and operating the Care Everywhere health information exchange platform, failed to implement adequate controls to detect and prevent unauthorized or improper access through that platform — including audit mechanisms capable of identifying anomalous access patterns, volume-based access thresholds, and verification procedures to confirm that entities accessing patient records through the HIE had legitimate treatment relationships with the patients whose records they sought. Defendant Reid failed to ensure that its vendor, Epic, maintained adequate oversight and governance over third-party access to Defendant Reid's patient records through the Care Everywhere platform. Defendant Health Gorilla failed to implement adequate procedures to verify the bona fide treatment purposes of entities it admitted to the Carequality and TEFCA frameworks before granting those entities access to patient records.

61. Defendants could have prevented this Data Breach through a number of readily available measures, including implementing treatment-relationship verification requirements before granting HIE access; deploying anomaly detection systems to flag

[18] *Id.*

unusual record access patterns; conducting regular audits of third-party access logs; imposing volume-based access controls; and requiring periodic re-certification of treatment purpose by entities accessing patient records through the exchange.

62. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent unauthorized access, resulting in the Data Breach and unauthorized third parties acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

***Plaintiffs' Experience***

63. Plaintiff Fox was a patient at Reid prior to the Data Breach.

64. Plaintiff Bryan was a patient at Reid prior to the Data Breach.

65. As a condition of obtaining medical treatment services at Defendant Reid, they were required to provide their Private Information to Defendants, including their name, contact information, date of birth, Social Security number, health insurance information, payment/financial account information, medical history information, and other Private Information.

66. At the time of the Data Breach, Defendants maintained Plaintiffs' Private Information in their systems.

67. Plaintiffs are very careful about sharing their sensitive Private Information. They store any documents containing their Private Information in a safe and secure location. They have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. They would not have entrusted their Private Information to Defendants had they known of Defendants' lax data security policies.

68. Plaintiffs learned of the Data Breach through Defendants' limited public disclosures, news reports, and the filing of Epic's lawsuit against Defendant Health Gorilla (Case No. 2:26-cv-00321, C.D. Cal.), which revealed that patient records—including those of Defendant Reid's patients—had been accessed by Defendant Health

Gorilla's clients through Epic's Care Everywhere platform for non-treatment purposes because Defendant Health Gorilla failed to adequately verify access requests. Plaintiff Bryan received a written notice of the Data Breach from Defendant Reid, and upon information and belief, Plaintiff Fox was also mailed such a notice. However, the notice did not adequately identify the full scope of the breach or how Plaintiffs' data was misused. Neither Defendant Epic nor Defendant Health Gorilla has provided any individualized notice of any kind to Plaintiffs or Class Members.

69. Upon information and belief, Defendant Reid mailed a written notice of the Data Breach to one or more Plaintiffs and certain Class Members. Plaintiff Bryan recalls receiving a letter from Defendant Reid informing her that her information may have been involved in a data breach. Upon information and belief, Plaintiff Fox was also mailed such a notice. The notice did not come from Defendant Epic, which has provided no individualized notice of any kind to Plaintiffs or Class Members regarding the Data Breach.

70. Since the Data Breach, Plaintiff Bryan has experienced repeated incidents of fraudulent charge attempts on her debit card linked to her joint checking account. Over the past one to two years, Plaintiff Bryan has been required to change her bank username and password approximately nine times as a result of these unauthorized charge attempts. Following each incident, her bank detected the suspicious activity, locked her card, and required her to contact the bank to verify transactions and resolve the issue. Each such incident resulted in the cancellation of her affected debit card and the issuance of a replacement card, requiring her to wait approximately seven to ten business days to receive a new card. As recently as February 2026, Plaintiff Bryan experienced another fraudulent charge attempt on her debit card. These repeated incidents of unauthorized charge attempts are consistent with the misuse of Private Information compromised in the Data Breach.

71. Each fraudulent charge attempt has caused Plaintiff Bryan significant inconvenience and lost time. On multiple occasions, Plaintiff Bryan's debit card was

locked without her knowledge, preventing her from purchasing groceries, gasoline, and other necessities. Each time, Plaintiff Bryan was required to spend approximately sixty minutes contacting a bank representative or coordinating with her husband to resolve the issue. The time Plaintiff Bryan has spent addressing these repeated incidents—time she would otherwise have devoted to work, family, and personal activities—has been lost and cannot be recaptured.

72. Plaintiff Bryan has additionally suffered actual injury in the form of experiencing an increase in unwanted calls, texts, and/or emails, which, upon information and belief, were caused by the Data Breach due to proximity in time. This obvious and actual misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with unwanted emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

73. As a result of the Data Breach, Plaintiffs made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. They have spent significant time dealing with the Data Breach—valuable time they otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

74. At the instant Plaintiffs' Private Information was accessed by unauthorized third parties without their consent or authorization, they suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

75. The Data Breach has caused Plaintiffs to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed them of key details about the Data Breach's occurrence.

76. As a result of the Data Breach, Plaintiffs have already spent time and incurred out of pocket costs and anticipate spending in the future considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

77. As a result of the Data Breach, Plaintiffs are at a present risk and will continue to be at increased risk of identity theft and fraud for their lifetime.

78. Plaintiffs have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

79. Defendants' conduct resulted in the unauthorized disclosure of Plaintiffs' private information to unauthorized third parties. The unauthorized disclosure of Plaintiffs' Private Information constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendants' failure to adequately secure the Private Information in their custody, and has resulted in actual, particularized, and concrete harm to the Plaintiffs. The injuries Plaintiffs suffered, as described herein, can be redressed by a favorable decision in this matter.

80. Defendants' conduct, as evidenced by the circumstances of the Data Breach, has resulted in Plaintiffs' actual fraud and creates an imminent risk of future identity theft, fraud, or other forms of exploitation.

81. More specifically, the exposure to the Data Breach caused Plaintiffs to: (i) spend money on mitigation measures like credit monitoring services and/or unauthorized third parties searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach.

82. Plaintiffs' mitigation measures were not a self-inflicted harm, as these actions were taken after the data breach occurred but before Defendants provided them with any adequate explanation of the Data Breach. To the extent Defendant Reid subsequently mailed a notice of the Data Breach to certain Plaintiffs, such notice was inadequate to inform Plaintiffs of the full scope and nature of the breach, as described herein.

83. Plaintiffs have a continuing interest in ensuring that their personal information is kept confidential and protected from disclosure, and they should be entitled to injunctive and other equitable relief.

***The Data Breach Was Foreseeable: Defendants Knew, or Should Have Known, of the Risk Because Healthcare Entities in Possession of Private Information are Particularly Susceptible to Cyber Attacks***

84. Defendants knew or should have known of the risk of a data breach, especially because healthcare entities in possession of Private Information are particularly susceptible to cyber attacks.

85. Defendants' data security obligations were particularly important given the substantial increase in unauthorized access incidents and/or data breaches targeting

healthcare entities that collect and store Private Information, like Defendants, preceding the date of the breach.

86. Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

87. In 2024, an all-time high for data compromises occurred, with 3,158 compromises affecting approximately 1.3 billion total victims.[19] Of the 3,158 recorded data compromises, 536 of them, or 17% were in the medical or healthcare industry.[20] The 536 breaches reported in 2024 exposed approximately 47 million sensitive records.[21]

88. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023),[22] Defendants knew or should have known that their electronic records would be targeted by unauthorized third parties.

89. Additionally, as companies became more dependent on computer systems to run their business,[23] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by unauthorized third parties is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[24]

---

[19] *See* Identity Theft Resource Center, *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited February 11, 2026).
[20] *Id.*
[21] *Id.*
[22] https://www.hipaajournal.com/security-breaches-in-healthcare/
[23] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[24] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

90. Defendants knew and understood unprotected or exposed Private Information in the custody of healthcare companies, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

91. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

92. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

93. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

94. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

95. As healthcare entities in custody of the Private Information of their clients and patients, Defendants knew, or should have known, the importance of safeguarding Private Information entrusted to them by Plaintiffs and Class Members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

***Value of Private Information***

96. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[25] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[26]

97. The PII and PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[27]

98. For example, Personal Information can be sold at a price ranging from $40 to $200.[28] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[29]

99. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft,

---

[25] 17 C.F.R. § 248.201 (2013).

[26] *Id.*

[27] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[28] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[29] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

100. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

101. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

102. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[30] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[31] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[32]

103. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016—the same as a Facebook account. That pales in comparison with the asking price for medical data,

---

[30] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed February 11, 2026).

[31] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed February 11, 2026).

[32] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed February 11, 2026).

which was selling for $300 and up.[33] Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[34]

104. Healthcare data is especially prized by data thieves. The National Association of Healthcare Access Management reports, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information."[35]

105. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[36]

106. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[37] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[38]

107. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in

---

[33] Paul Ducklin, *FBI "ransomware warning" for healthcare is a warning for everyone!*, Sophos (Oct. 29, 2020) *available at* https://news.sophos.com/en-us/2020/10/29/fbi-ransomware-warning-for-healthcare-is-a-warning-for-everyone/ (last visited February 11, 2026).

[34] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited February 11, 2026).

[35] Laurie Zabel, *The Value of Personal Medical Information: Protecting Against Data Breaches*, NAHAM Connections, *available at* https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information (last visited February 11, 2026).

[36] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed February 11, 2026).

[37] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed February 11, 2026).

[38] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed February 11, 2026).

a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

108. In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

109. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendants Failed to Comply with FTC Guidelines***

110. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

111. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's

vulnerabilities; and implement policies to correct any security problems.[39] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[40]

112. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

113. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

114. These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

115. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the

---

[39] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited February 11, 2026).

[40] *Id.*

integrity of their data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner.

116. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

117. Defendants were always fully aware of their obligation to protect the PII and PHI of its patients. Defendants were also aware of the significant repercussions that would result from its failure to do so.

118. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

***Defendants Failed to Comply with HIPAA Guidelines***

119. Defendants are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

120. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[41] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

121. HIPAA's Privacy Rule — formally titled the *Standards for Privacy of Individually Identifiable Health Information* — establishes national standards for the protection of health information and governs the permissible uses and disclosures of protected health information by covered entities and their business associates.

[41] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

122. HIPAA's Security Rule — formally titled the *Security Standards for the Protection of Electronic Protected Health Information* — establishes a national set of security standards for protecting health information that is created, received, maintained, or transmitted in electronic form.

123. HIPAA requires “compl[iance] with the applicable standards, implementation specifications, and requirements” of HIPAA “with respect to electronic protected health information.” 45 C.F.R. § 164.302.

124. “Electronic protected health information” is “individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media.” 45 C.F.R. § 160.103.

125. HIPAA’s Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
d. Ensure compliance by its workforce.

126. HIPAA also requires Defendant to “review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information.” 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to “[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.” 45 C.F.R. § 164.312(a)(1).

127. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect

against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

128. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[42]

129. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

130. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

131. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[43] The list of resources includes a link to guidelines

---

[42] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).
[43] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-." US Department of Health & Human Services, Guidance on Risk Analysis.[44]

***Defendants Failed to Comply with Industry Standards***

132. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

133. Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

134. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

135. Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

136. As evidenced by the Data Breach and its timeline, Defendants failed to follow some or all these industry best practices.

137. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without

[44] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

138. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiffs and the Class Members Injury and Damages***

139. Plaintiffs and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendants, that has occurred, is ongoing, and/or will imminently occur.

140. Data Breaches such as the one experienced by Defendants' patients are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

141. As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiffs' and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

142. Once an individual's Private Information is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised data to gather and steal even more information.[45]

---

[45] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited February 11, 2026).

143. The ramifications of Defendants' failure to keep Plaintiffs' and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

144. Because Defendants failed to prevent the Data Breach, Plaintiffs and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their Private Information;

i. Delay in receipt of tax refund monies; and,

j. The continued risk to their PII and PHI, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect

the PII and PHI in its possession.

***The Data Breach Caused Plaintiffs and the Class Members Increased Risk of Identity Theft***

145. Furthermore, the Data Breach has placed Plaintiffs and the proposed Class Members at an increased risk of fraud and identity theft.

146. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiffs' and Class Members' PII and PHI falling into the hands of unauthorized third parties.

147. The unencrypted PII and PHI of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

148. Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

149. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

150. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to

unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

151. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

152. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[46]

153. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

154. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and

[46] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited February 11, 2026).

employment histories and other private information increases."[47] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[48]

155. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[49]

156. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[50] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[51]

157. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

---

[47] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[48] *Id.*

[49] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[50] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[51] *See* https://www.investopedia.com/terms/s/ssn.asp

158. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

159. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

160. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[52]

161. The California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[53]

162. Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your

---

[52] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

[53] *See* https://oag.ca.gov/idtheft/facts/your-ssn

insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[54] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

163. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

164. What's more, theft of PII and PHI is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII and PHI are valuable property rights.

165. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

166. Where the most PII and PHI belonging to Plaintiffs and Class Members was accessible from Defendants' network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

---

[54] *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited February 11, 2026).

167. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

168. Thus, Plaintiffs and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

169. Accordingly, the Data Breach has caused Plaintiffs and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

170. Defendants knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

171. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

172. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiffs' and Class Members' Social Security numbers or other government identification are affected.

173. By spending this time, Plaintiffs were not manufacturing their own harm, they were taking necessary steps at Defendants' direction.

174. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

175. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[55]

***Diminution in Value of Private Information***

176. PII and PHI are valuable property rights.[56] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

177. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[57]

---

[55] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[56] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[57] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited February 11, 2026).

178. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[58]

179. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[59]

180. Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[60]

181. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

182. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

---

[58] https://datacoup.com/ (last visited February 11, 2026).

[59] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited February 11, 2026).

[60] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited February 11, 2026).

183. Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

184. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

## V. DEFENDANTS' BREACH

185. Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendant Epic failed to maintain adequate security over the systems hosting the Private Information, and Defendant Reid failed to ensure that its vendor maintained reasonable safeguards. Defendant Health Gorilla, as the gatekeeper and operator of the health information exchange through which patient records were improperly accessed, failed to implement adequate verification procedures to ensure that entities accessing patient data through its network had legitimate treatment purposes and proper authorization, and failed to properly monitor its network for unauthorized or improper access activity. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendants' protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules related to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to train all members of Defendants' workforce effectively on the policies and procedures about PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted

the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304, definition of "encryption").

186. As the result of Defendant Epic's computer systems needing security upgrading, Defendant Reid's inadequate vetting and oversight of its vendors, Defendant Health Gorilla's failure to implement adequate access verification procedures to ensure that entities accessing patient records through its health information exchange network had legitimate treatment purposes and proper authorization, and all Defendants' failure to monitor and protect the Private Information in their custody, Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

187. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

## VI. PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

188. To date, Defendants have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

189. Defendants' failure to provide Plaintiffs and Class Members with any relief is wholly unacceptable and insufficient to make them whole who commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

190. Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

191. Plaintiffs' Private Information was compromised and disclosed to

unauthorized third parties as a direct and proximate result of the Data Breach.

192. Plaintiffs were damaged in that their Private Information is in the hands of cyber criminals.

193. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

194. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

195. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

196. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

197. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

198. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

199. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

200. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to

remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;
b. Canceling and reissuing credit and debit cards;
c. Purchasing credit monitoring and identity theft prevention;
d. Addressing their inability to withdraw funds linked to compromised accounts;
e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;
f. Placing "freezes" and "alerts" with credit reporting agencies;
g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;
h. Contacting financial institutions and closing or modifying financial accounts;
i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;
j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and
k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

201. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

202. Further, because of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the

most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

203. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII. <u>CLASS ACTION ALLEGATIONS</u>

204. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to the Federal Rules of Civil Procedure Rule 23.

205. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **Nationwide Class: All persons within the United States of America whose Private Information was exposed to unauthorized third parties as a result of the data breach allegedly discovered by Defendants Reid and Epic on or before January 13, 2026.**

206. Excluded from the Class are Defendants' officers and directors, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and members of their staff.

207. Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

208. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number and identities of Class Members are unknown to Plaintiffs at this time, as such information is in the sole possession of Defendants and ascertainable through its records.

209. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These

common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Class Members to safeguard their Private Information;

g. Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiffs and Class Members suffered legally cognizable damages from Defendants' misconduct;

i. Whether Defendants' conduct was negligent;

j. Whether Defendants were unjustly enriched;

k. Whether Defendants failed to provide notice of the Data Breach

promptly; and

l. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

210. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

211. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

212. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

213. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

214. The prosecution of separate actions by individual Class Members would

create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

215. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

216. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and All Class Members)

217. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

218. Defendants required Plaintiffs and Class Members to submit non-public personal information to obtain healthcare services.

219. By collecting this data and entrusting it to Defendant Epic for storage on its computer systems, and by sharing it and using it for commercial gain, Defendants each had a duty of care to use reasonable means to secure and safeguard the Private Information. Defendant Reid had a duty to ensure that its vendors, including Epic and Health Gorilla, maintained adequate security. Defendant Epic had a duty to safeguard the computer systems and data entrusted to it. Defendant Health Gorilla, as the operator of the health information exchange network and gatekeeper controlling access to patient records, had an independent duty to implement adequate access verification

procedures, to ensure that only entities with legitimate treatment purposes and proper authorizations could access patient records through its network, and to monitor its network for unauthorized or improper access activity. Defendant Mammoth Path Solution, LLC, as an entity that accessed patient health records through the Carequality and TEFCA interoperability frameworks, had an independent duty to access records only for legitimate treatment purposes, to accurately represent its treatment relationship with patients when requesting those records, to refrain from misusing or improperly disclosing patient health information, and to not use those records for purposes unrelated to patient care. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

220. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

221. Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between Defendants and their clients and patients, which is recognized by laws and regulations including, but not limited to, HIPAA, as well as common law. Defendants could ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

222. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all the healthcare information at issue constitutes "protected health information" within the meaning of HIPAA.

223. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

224. Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

225. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
b. Failing to adequately monitor the security of their networks and systems;
c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;
d. Allowing unauthorized access to Class Members' Private Information;
e. Failing to detect timely that Class Members' Private Information had been compromised; and
f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.
g. As to Defendant Mammoth Path Solution, LLC specifically, affirmatively misrepresenting to Defendant Health Gorilla and to the Carequality and TEFCA interoperability frameworks that patient record access was needed for treatment purposes when, upon information and belief, it was not;

h. As to Defendant Mammoth Path Solution, LLC specifically, accessing patient health records without any legitimate treatment relationship with the patients whose records were obtained, including Plaintiffs and Class Members; and

i. As to Defendant Mammoth Path Solution, LLC specifically, improperly using, disclosing, and/or monetizing patient health records obtained through false pretenses, including, upon information and belief, providing those records to third-party entities for non-treatment commercial purposes.

226. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of unauthorized access and data breaches in the healthcare industry.

227. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

228. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

229. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

230. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiffs and All Class Members)**

231. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

232. When Plaintiffs and Class Members provided their Private Information to Defendants in exchange for healthcare with Defendants, they entered implied contracts with Defendants under which Defendants agreed to reasonably protect such information. As to Defendant Health Gorilla specifically, Plaintiffs and Class Members are intended third-party beneficiaries of the agreements between Defendant Health Gorilla and its clients (including Defendant Reid) and the agreements between Defendant Health Gorilla and the health information exchange frameworks under which it operated, all of which required Defendant Health Gorilla to safeguard patient health information and to ensure that access to such information was limited to entities with legitimate treatment purposes. As to Defendant Mammoth Path Solution, LLC specifically, Plaintiffs and Class Members are intended third-party beneficiaries of the agreements Mammoth Path Solution executed with Defendant Health Gorilla and with the Carequality and TEFCA interoperability frameworks as conditions of its participation in those networks, all of which expressly required Mammoth Path Solution to access patient records only for legitimate treatment purposes and to safeguard any patient information obtained through those networks; Mammoth Path Solution breached those agreements by obtaining patient records under false pretenses of treatment and improperly using and/or disclosing those records.

233. Defendants solicited, offered, and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

234. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards.

235. Plaintiffs and Class Members paid money to Defendants with the reasonable belief and expectation that Defendants would use part of their earnings to obtain adequate data security. Defendants failed to do so.

236. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

237. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

238. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

239. Defendants breached their implied contracts with Class Members by failing to safeguard and protect their Private Information.

240. As a direct and proximate result of Defendants' breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

241. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

242. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiffs and All Class Members)**

243. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein

244. Every contract in this State has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

245. Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendants.

246. Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Defendants knew or should have known of unauthorized access that occurred during the Data Breach.

247. Defendants acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above seek the following relief against Defendants, as follows:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. For equitable relief enjoining Defendants from engaging in the

wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendants to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For an Order directing Defendants to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

e. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f. For an award of punitive damages, as allowable by law;

g. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h. Pre- and post-judgment interest on any amounts awarded; and

i. Any other relief that this court may deem just and proper.

Dated: April 30, 2026

*/s/ Mark T. Freeman*

Mark T. Freeman, Esq.
Leigh Montgomery *
*Pro Hac Vice* Forthcoming
***Attorneys for Plaintiffs***

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as to the entire action and all Claims for relief.

Dated: April 30, 2026

*/s/ Mark T. Freeman*

Mark T. Freeman, Esq.
Leigh Montgomery*
**Pro Hac Vice*
Forthcoming

***Attorneys for Plaintiffs***